[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action arising out of a contract entered into between the plaintiffs and the defendant to construct improvements to the plaintiff's home, including construction of a sunroom addition and renovations to the existing structure. On November 15, 1991, the plaintiffs, Barbara Banville and Suzanne Lawlor, entered into an agreement with a representative of the CT Page 10855 defendant, Advanced Home Improvement Company, (hereinafter, "Advanced"), for the construction of an "affordable sunroom" to be built off the rear of the plaintiffs' split-level home on top of an existing deck structure. The contract also called for improvements to the deck, replacement of a sliding patio door, and a "valley system" flashed into the existing roof. There was a written job change order signed by the parties on January 31, 1992, to replace the first sliding patio door installed with a different model. Sometime later, additional work was also performed by Advanced for which there was no written contract to secure the issuance of a certificate of occupancy.
The court finds from the evidence presented that the defendant has been paid in full for all contractual work performed and all materials provided by him under the written contracts between the parties. With respect to the additional work performed without a contract, the defendant was not paid, but did not present a timely claim as part of its defense to this action.
The original contract warrantees the workmanship of Advanced, its employees and/or subscontractors for one year. In addition, materials were warranteed to the extent of the original manufacturer's warranty. Defects caused by external means were excluded. The contract specifically excludes Advanced's responsibility for landscaping and the obtaining of a certificate of occupancy.
The parties dispute whether or not the work performed by the defendant was done in a workmanlike manner and in accordance with an express or implied warranty. In their revised complaint,[1]
the plaintiffs allege specifically that the defendant failed to construct the sunroom in a workmanlike manner; specifically, they claim the room is "out of square, windows are unable to be closed and locked, the roof, windows and skylights leak, the door will not close and lock properly and the gutter system was improperly installed." The second count alleges a breach of the builder's warranty. In the third count, the plaintiffs allege that Advanced breached the contractual terms of the job change order for the replacement of the sliding patio door.
In the late fall of 1991, the plaintiffs met Mark Harrington, President and salesman for Advanced at a home show, where he displayed pre-fabricated sunrooms. Subsequent to their initial meeting, Harrington went out to the plaintiffs' home in CT Page 10856 Southington, and after several discussions, the November 15, 1991 contract was signed. When the plaintiffs and the defendant discussed repouring a concrete patio located below an existing exterior deck, Harrington explained to them that bringing a cement truck into the back yard to pour concrete would leave ruts and other damage to the grounds for which Advanced would not be responsible, as the contract specifically excludes landscaping work.
Work on the addition began in December, 1991. When the cement truck arrived and was driven to the back of the house, the truck, as anticipated, left tire ruts. After the cement work was completed, the plaintiffs regraded the backyard lawn themselves, spending a few dollars on a bag of grass seed. Banville could not remember exactly what the new seed cost.
After the defendant installed the new sliding patio door at the rear basement entrance, the plaintiffs decided they wanted a different model door. On January 31, 1992, a job change order was signed wherein the plaintiffs agreed to pay an additional $700.00 for the new door. The defendant agreed to remove the first door installed and put in the more expensive model. The change order provided that if the defendant ever resold the first door, it would reimburse the plaintiffs $400.00. There was no deadline or conditions specifying what efforts the defendant had to make to resell the door, nor is there any evidence that Advanced ever resold it.
Shortly after the completion of the sunroom on February 7, 1992, the plaintiffs complained complaints orally to Harrington that the gutters and skylights were leaking and the backyard lawn was damaged due to the cement truck. Harrington refused to do anything further about the lawn damage because the contract excluded landscaping.
Lawlor testified that subsequent to February 1992, the defendant made significant efforts to correct the skylight and window problems. She recalled that the roof was removed twice and replaced, and the whole south side of the sunroom was removed and replaced because some of the sliding windows were leaking. She admitted the south side window leaking was corrected, and that the windows' movement on their track was much better.
On April 24, 1992, the plaintiffs sent a letter to the defendant indicating that the skylight leaks had been corrected, CT Page 10857 but not the leaking gutter. However, in 1993 and 1994, in response to subsequent complaints about leaking skylights, Thomas Hubbell, a contractor hired by Advanced, resealed the skylights and twice checked for leakage by running a hose on top of the skylights for over an hour while another laborer stood in the room beneath the skylights. No leakage was detected. In September of 1993, during a torrential downpour of almost a half-hour in duration, Harrington, Spoci, the plaintiffs and their first attorney observed no leaks.
The defendant contends, and the court agrees, that the so-called skylight "leaks" are actually caused by unavoidable, and not uncommon, condensation. Plaintiffs introduced a videotape that shows drops of water dripping from the metal frame edges of the skylights on a cold January day. The droplets evidenced on the tape appear to be condensation. In the winter, the sunroom, which is built on wooden stilts, is unheated except for the use of space heaters when it is occupied. The sunroom is adjacent to the dining room and the kitchen, where warm air is likely to begin circulating. Warm air emanating from the warmer, more sheltered spaces in the home could travel into the colder air of the sunroom, travel upward to the higher, interior metal frames of the skylights, and condense to dripping water.
The inability to produce a leak after abundant test flooding, and photographs of the skylights in evidence that show little, if any damage, to the surrounding wooden frame or ceiling, refute the plaintiffs' assertion that the skylights were improperly sealed. The plaintiff's expert, Phil Spoci, never dismantled the skylights to determine the actual cause of the "leaks." He presented three "possible" theories, but he did not personally observe or test for any leaks, and in his written report, he concludes that the actual cause of leakage cannot be determined.
The next issue which requires consideration is the alleged gutter leak. The roofline of the sunroom is at a different pitch from the existing roofline of the back of the house. In connecting the sunroom to the house, a valley was formed between the two roof lines which results in a greater flow of water down the seam connecting the two roofs. The initial contract did provide for flashing in the area of this valley which would, presumably, compensate for the flow of additional water from the roof of the sunroom. The existing gutter on the house was not refashioned to handle this additional flow, and the new gutters on the sunroom did not accommodate it. The flow eventually caused CT Page 10858 some rotting damage to a kitchen "garden window" below, which the plaintiffs were able to replace under a warranty. They claim damages for a portion of the repair to the kitchen window in the amount of $190.00, and an additional $100.00 Spoci estimates it will cost to reinstall the gutter or gutters to properly handle the water flow.
Plaintiffs also claim the room is significantly out of square and that the windows don't open, close, or lock properly. Just when the problem with the side windows and locks occurred, and the extent of the problem is unclear. In 1994, at the plaintiff's insistence, Advanced sent a crew out to install a special device in the window sills to make the windows slide open and shut more easily, and the windows worked well after that. No one complained to Advanced about the window locks then. The only written complaint to Advanced within the year subsequent to the completion of the sunroom makes no mention of windows and doors not properly closing or locking. In addition, Spoci could not even say whether the sagging and imperfections he claims he observed in the window sills, which are not visible in the photos in evidence, was the result of poor installation procedures at the manufacturer's factory or defective workmanship by the defendant.
Harrington testified that if the extent of assymetry Spoci claimed he measured in 1995 existed during the sunroom's construction, the pre-fabricated pieces of the room never would have fit together. The measurements taken three years after the completion of construction by plaintiff's expert, Spoci, in September of 1995, if accurate, cannot, by a fair preponderence of the evidence, lead to the conclusion that the sunroom was out of square at the time of its completion in February 1992.
It is quite obvious from the photos and videotape in evidence that the plaintiffs use and enjoy this sunroom frequently. They have furnished it with upholstered furniture and carpet and a considerable number of decorative objects.
Conclusion
The court finds by a fair preponderence of the evidence that the construction of the gutter valley system was not performed in a workmanlike manner and the failure to correct the defect in the gutter violated the builder's warranty. CT Page 10859
The plaintiffs have failed to prove by a fair preponderence of the evidence that the construction of the skylights, roof or side windows was not performed in a workmanlike manner, resulting in leakage or doors and windows that do not properly close or lock. The plaintiff's also have failed to prove by a fair preponderence of the evidence any breach of the builders' or manufacturers' express or implied warrantees relating to the skylights, roof or side windows.
Finally, there is no evidence Advanced sold the first sliding patio door, or that Advanced was required to sell or reuse the first door within any specific time; hence, there is no proven breach of the company's agreement with the plaintiffs with respect to reimbursement of $400.00.
Judgment shall enter for the plaintiffs on Counts 1 and 2 in the amount of $290.00. Judgment shall enter for the defendant on Counts 3 and 4. No costs or fees are awarded to either party.
KELLER, J.